FILED
IN CLERKS OFFICE
U.S. ——— ——— N.Y.

☆   AUG 0 4 2003   ☆

P.M. _____
TIME A.M. _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                         :

ROBERT EISEMANN,               :

                Petitioner,    :           MEMORANDUM,

                         :           JUDGMENT & ORDER

     – against –           :           99-CV-2826 (JBW)

                         :           03-MISC-0066 (JBW)

VICTOR HERBERT, Superintendent  :
Collins Correctional Facility,       :

                         :

             Respondent.    :

                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JACK B. WEINSTEIN, Senior District Judge:

The petition for a writ of habeas corpus is granted. Defense counsel's representation and conflicts so tainted this conviction as to require its being characterized as a nullity. That defense counsel's associate, who conducted most of the actual trial, did a decent job does not mitigate the serious constitutional violations.

A hearing was held in this matter. Petitioner's counsel was present in person. The court ordered petitioner to be available by telephone, but he was not because of administrative problems at the prison. His presence was waived by his appointed habeas corpus counsel. Since only issues of law are involved, with no need for an evidentiary hearing, the waiver is accepted. Petitioner will be furnished with a full transcript of the hearing.

Because resolution of this matter requires the court to determine whether petitioner's trial lawyer provided him with effective representation, the court sought the attendance of petitioner's trial lawyer at the hearing. The court has been informed that the lawyer, who was disbarred and convicted of fraud sometime after petitioner's trial, is deceased.

I.      Introduction

Petitioner Robert Eisemann was convicted of three counts of sodomy in the first degree for sexually molesting his girlfriend's seven-year-old daughter. His father, Henry Eisemann, was also charged with sodomizing the same girl. Both men were represented by attorney Harold Holtman at overlapping times. In the course of representing the Eisemanns, Holtman committed numerous egregious violations of the rules of professional responsibility and the law. He bilked the Eisemann family of relatively exorbitant sums of money, fabricated affidavits to excuse his conduct, threatened to put petitioner in jail if he did not vouch for the fabricated affidavits, and advised petitioner to flee while the jury was deliberating. Holtman was later disbarred.

Holtman's representation of both Robert and Henry Eisemann created an actual conflict of interest that caused him to forego reasonable alternative defense strategies on petitioner's behalf. This conflict violated petitioner's right to the effective assistance of counsel and mandates habeas corpus relief.

Holtman's self-interest in concealing his malfeasance created a second conflict of interest that adversely affected his representation of petitioner. Although unnecessary to resolution of the habeas application, this ground too would provide a basis for granting the writ.

II.     Factual and Procedural Background

        A.      The Arrest and Interrogation

Petitioner had a long-term relationship with Josephine Sciubra. The couple lived together for a number of years and had a son together, Robert Eisemann, Jr. Ms. Sciubra had two other children from a previous relationship: a daughter named Theresa R., seven years old at the time of the incidents in question, and her twin brother, Timothy.

2

Petitioner and Sciubra's relationship ended. He petitioned the Family Court to obtain unsupervised visitation rights for his son. Ms. Sciubra opposed.

While this domestic-relations litigation was in progress, Theresa R. accused petitioner of anally sodomizing her on five occasions. Theresa also claimed that Eisemann's father, Henry, had sodomized her.

On August 8, 1985, petitioner was approached by the police at work and was told to accompany them back to the police station. Upon his arrival, he was told that he was under arrest for sodomizing a child.

After being read his *Miranda* rights, petitioner denied the allegations. Detective Jordan informed petitioner that his father had been arrested earlier in the day for sodomizing Theresa, her brother, and petitioner's son Robert; and that his father had confessed to the crime. Petitioner broke down and cried. *See* Hr'g Tr. at 10. After recovering from the shock of being informed that his father had molested his grandson, petitioner spoke to Detective Vincent Jordan.

It is undisputed that while at the police station petitioner signed an inculpatory, written statement concerning the allegations. Hotly contested, however, are the circumstances of the interrogation which led to the signing of the statement. The interrogation was neither audiotaped nor videotaped.

Detective Jordan's account at trial of the interrogation and ultimate signing of the confession presented petitioner as spontaneously offering the detective details of the sexual abuse of Theresa. According to the detective, he began the interrogation by asking petitioner why Theresa would allege that he had sodomized her, and that petitioner responded, "Well, it's not the way it seems." Trial Tr. at 103. The detective then testified that petitioner told him, in

3

essence, that he had a strong sex drive that was unfulfilled by Ms. Sciubra, that he would

sometimes cuddle with Theresa and get an erection, and that he had once placed his penis to the

anus of Theresa mistakenly believing that he was about to engage in anal intercourse with Ms.

Sciubra. *Id.* at 103–05.

Detective Jordan prepared a statement which Eisemann signed. The first part of the

statement contains Eisemann's biographical information and a *Miranda* waiver. The substantive

part of the statement reads as follows:

> Sometime, over a year ago, I was living with Josephine Sciurba [sic] whom
> [everybody] calls Kathy. At that time I was having a drinking problem off and on
> and also emotional problems with Kathy. [This] included having no sex with
> Kathy. I have a large sex drive and could not get satisfaction. Due to these
> prob[lems] I found my self [sic] getting into bed with Kathy's daughter Theresa.
> This happened on three or four different occasions. This would happen when
> Kathy was out [of] the apartment and I knew she was cheating on me staying out
> to all hours. When I would get into bed with Theresa ["Kathy" is crossed out and
> "Theresa" is handwritten in] I would cuddle up behind her and hug [her] for
> affection. Theresa would be wearing a night shirt but no underware [sic]. As I
> would cuddle up with Theresa I would naturally have an erection whcih [sic]
> would come out of the top of my underpants. On one occasion I spread [t]he
> cheeks and pressed my erect penis against her anus. I remember Theresa ["Kathy"
> is crossed out and "Theresa" is typed in] said it hurt so I stopped and got out of
> bed and went into the bathroom and masturbated. This happened other times but I
> stopped when Theresa complained of pain or I just did not go all the way.
> Sometime I would just go into the living room and cool off them [sic] I would
> masturbate. I know I need help and [have] been attempting to get it.
>
> Further, I would like to state that on one occasion I was sleeping with [omitted]
> and we would have anal sex together. I remember cuddling someone and I
> t[hought] it was Kathy. I had an erection and put it into her anus and penatrated
> [sic] her. All of a sudden I heard Theresa's voice and I realized she was in bed
> with [me] and I, and it was her who I had stuck my penis in. I took out my penis
> and rolled over and went back to sleep.
>
> . . . .
>
> As to the above statement I would like to clear up a point. When I stated above

4

that I penetrated Theresa thinking it was Kathy, I mean to say that I went in a little bit not all the way.

Each paragraph is signed by petitioner, Detective Jordan, and Detective Dempsey. The statement is dated August 8, 1985.

Petitioner's recounting of the interrogation that led to his signing of the above statement purports to flesh out the context in which it was generated. According to Eisemann's testimony at a pretrial hearing, detectives engaged in some banter with him, asked for some boxing lessons, and then began asking about the alleged abuse:

> A   He said to me, you know, Bobby, the last time you were in here, Kathy – you were telling me how you and Kathy don't get along and how you moved out and, you know. And I said, Yeah, I never went back to her. I go, I'm still with Laura, the girl you met. I go, Yeah – and then he said – well, he goes, you know, How did you live without sex for that long? He goes, Don't you have like a normal sex drive? And I said, Yeah, I got a good sex drive, never thinking that he would turn it around and say I got a horrendous sex drive, you know. That's ridiculous, the way this guy emphasized the whole damn thing. And then he told me like this. He goes, When you and Kathy were fighting, wouldn't you, you know, like take comfort in the children being around you? I said, That's the only thing that kept me in that house that long. I hated that girl after a while with the way she was filthy and dirty and wouldn't do nothing around there. I was the one who washed their clothes and cooked and took them shopping and everything else, not her. My friends would take me with their cars to go do that.
>
> Q   What did Detective Dempsey tell you when you told him that, if anything?
>
> A   He said, Of course, I know the way you are with your kids. You're very sensitive about them. The last time you said that if you could take them how, you would. Make no mistake, if I had my kids, I would have loved to move out. The first time she ever said to me, Why don't you take your son, your fox and get out of the house. That's what started this. Plain and simple. And he goes to me – then he says, where do you think they would come up with an accusation like this? I go, Plain and simple, from the mother who has been doing nothing but calling and harassing me and my fiancé, now who I am happy with. She can't bear the thought of us being happy. Have the phone bills subpoenaed. See how many calls she has made to my house, even though there is one hundred orders of protection on me.
>
> Q   What did Detective Dempsey say when you told him about that?

5

A   He said, I would like to see you get them kids.  He goes, With me helping you out and this and that – this guy is my buddy, right, person who tells me, Don't worry about anything at the end of the night.  I'll be there for you in the morning.  And like a jerk, I'm looking through the cell block for him and his partner in every cop car that pulls up.

Q   Let's not get into that.

A   Okay.

Q   What was the next thing that happened, in order?

A   Okay.  He says, Now, didn't the kids ever crawl into bed with you?  I said, Sure.  He goes, Well didn't you enjoy it when the kids would crowd around you and you would put you arms around them?  I said, Sure, who wouldn't?  And he said, Well, now, when you sleep at night, do you sleep in your underwear?  I said, Yes.  He said, When the kids come in, how were they dressed?  I told him, The kids very rarely had any clothes except for the ones I did and that  would back up, and when I would get fed up with doing it, because nobody else was – you know what I mean?  And I told him – I go, Of course, they wore just T-shirts a lot of times.  She wouldn't have underwear until I could get the underwear done.  I was boxing and working at the same time.  So, it didn't leave me very much time to do it.  I would do the laundry sometimes at 11:00 o'clock at night after a full day of work from 6:00 o'clock in the morning.  And he would say to me, Now, did you ever want to touch the children in any sexual way?  I said, No, come on, man, you're talking to me like a human being.  Where are you coming from with this nonsense?  And he is going on, No, I have to ask these questions.  Understand, it's my job.  I go, Okay, man, understand me.  I'm a father who has done nothing but take care of his kids since day one.  I fed my son his first bottle.  You're going to come off and tell me like because it's your job, I'm supposed to like it, but I won't like it.

Q   What happened next?

. . . .

A   Dempsey now goes, Okay, where are we?  I go, Okay, you were saying how the kids climb into bed with us.  Of course, when there is lightning out, they climb into bed with us and stuff.  And I go – well, now let me get to where the accusation gets sticky.  He goes, Now, when you lay down, how do you lay down?  I said, On my side.  He goes, well, how does the child lay down?  I go, Her side, like this.  He said to me, Now – which I never knew – When her buttocks is up against you, wouldn't it mold to your shape or is it hard as a rock?  I thought about it, and I said, Well, what do you mean by "buttocks"?  I go, I'm not doing nothing to her.  I go, I got my underwear on.  He is going, Well, – he goes, Her buttocks is not her anal opening.  I made him explain that.  I know it as an ass.  I have always said it was an ass, you know.

Q   So, what did you make him explain?

A   So, I made him explain what he meant by that, you know.  He goes, Well, wouldn't – if you were pressed up against her, wouldn't your penis be

6

penetrating her buttocks?  And I'm going, No.  And he's saying, Well, -- and he showed me with his fingers, because he seen I was having a hard time grasping his line of reasoning, and he held up his fingers like this.  Put your fingers around it.  And he goes, Now, picture you buttocks like this and your fingers here.  He goes, it's soft.  Wouldn't it squish around?  I said, Yeah.  He says, That's penetration.  I go, Get out of here.  He said, That's penetration.  By law, that's penetration.  I'm going, Because a kid leans up against you, because she is having nightmares or something and climbs into your bed and you put your arm around her, all of a sudden that's penetration?  And he's going, Yeah, but now we're understanding where these indications are coming from, these allegations are coming from.

Q   What happened next after that?

A   I said, Okay, if that's penetration, how am I doing it with my underwear on?  What type of underwear do you wear?  Well, short briefs.  And he goes, Well, when you sleep at night, he says, every guy when they wake up in the morning gets hard.  I go, Yeah, I can follow that.  Sometimes you have to use the bathroom in the morning.  He said to me -- he goes, Well, now, he goes, you have an erection.  It got to come over the top of the briefs.  Are you built like a little boy?  I said, I'll follow you along on that.  To be honest with you, Dempsey, I feel like I'm being railroaded here.

Q   What did you say to that, if anything?

A   He said like this, Come on.  He goes, you know, We can start this all over again.  But he says, I'm telling you, if you don't work along with me, you can wind up doing a year before they'll even hear your story.  And little did I know that's the one thing he honestly said right.  This is the first time in a year that anybody has heard my side.

Q   What happened next?

. . . .

A   He told me the last time I walked and this time I would walk.  Okay.  What happened now -- this is how he's saying.  Now, what happens, he tells me -- Okay, we're up to the part with the underwear.  He's saying to me how it sticks out of the top.  He says, Don't her night shirt rise up?  I go, Dempsey, give me a break here.  Man, I'm going, if I'm sound asleep, how the fuck could I be raping anybody?  I mean, it's a little bit impossible to rape somebody when you're sleeping.  I mean, dead cold sober from lifting lumber all day long, working out and training anywhere from 50 hours a week to boxing.  It's a little tough to stay awake.  He goes, Why are you so hostile to me?  I'm trying to help you.  Okay, man, I'm sorry.  If you work with me, we'll get you out of here or we can make this all night.  I said, Okay.  What do you want me to do?  He goes, There's a double murder that happens up the block from you.  He goes, We want you to take a lie detector test.  If you pass that, he goes, all you have to do is sign this statement.  He goes, We'll write it up for you.  No problem.  You sign it, you take the test, and I know you are innocent of that one, but I got to give you the lie detector test.  It's my job.  I go, Fine.  Then I could go home?  He goes, Yeah.  I

go, Can I make any phone call?  He said, There will be somebody in here in a minute.  They will take care of you.

. . . .

Q   Now, did there come a time when you signed something?

A   Yes.

Q   Was it a typewritten statement or a handwritten statement?

A   No; it wasn't a handwritten one.  It was like typed up and stuff, you know.

Q   Who typed it up?

A   Jordan, but Dempsey dictated to him exactly what to write.

Q   Did Jordan ask you any questions before typing the statement?

A   No.  As a matter of fact, I was kind of kept out of the whole ordeal, like Dempsey goes, Hey, we got it, no problem.  The guy is going to work with us.  I'm going to take him with me.  He goes, We'll get him some dinner, which was already promised, I am going to get dinner.  He said, Don't worry about it.  We'll eat something on the way.  The lie detector test will come out better.  Okay.  That was his exact words.  It makes the lie detector test come out better.  Like a dope, I believed him.

MR. REGAN:  I ask that the witness be shown People's 2 in Evidence.

THE WITNESS:  Yes, this is what he showed me that day.

Q   Who showed you that statement?

A   Detective Jordan.

Q   Was that ever read to you out loud?

A   No; he started to read it, and he got through a few things on top, and then he said, Oh, by the way, Bobby, you got to initial these mistakes, and he just stopped.  So, I initialed the mistakes, right.  He's going this one, then this one, and then he goes, you got to read it as you go along, right.  So I'm starting to read it again, and he says, Oh, here's another one, another wrong, turn the page and sign here and here.  He goes, Fine, fine.  I go like this, you know, I didn't even see the last page.  I went like this and started looking at it.  And they're sitting there like this.  Dempsey is going, Is everything all right?  I'm going, You know, Officer Dempsey, this don't look like anything you were telling me.  I go, I don't know where this is coming from.  I go, But you are telling me now that if I put it in her anus, I go, I thought that was the other part.  He's going, No, if you want this statement to clarify the other things, you got to say penetration.  And he says, What did I tell you?  He showed me with the fingers again.  He goes, If her ass is pressed up against you, it conforms to the outline of your body, and he is saying that means her body is wrapped around, which means you are inside.  That's penetration.  But I go, This doesn't sound right.  I'm really being railroaded here.  Maybe I should call Skir [petitioner's family court lawyer].  He goes, Bobby, would you trust me.  He says, you walked the last time.  It's all signed.  He goes, You're going to come with me.  The worst part of this is over.  Who gives a shit?

8

Who gives a shit about this bullshit?  All right.

Q   Was anything added to the statement at that point?

A   No.  All he told me then was that now that this thing – you know, I want this put in here.  I go, This doesn't sound right.  You're making me sound like I penetrated it, like I was doing it with her, and actually all she was doing was lying against me.  And I go, As far as sex-wise was concerned – and there was another thing that he had brought up.  How did you satisfy yourself?  And this was a little bit before this, if I could back up.  How did you satisfy yourself with Kathy when you and Kathy weren't doing anything?  I go, To be honest with you, I would masturbate.  I go – I go, I would wait for the kids to be asleep in their bedrooms.  I go, if they wanted me to lay down with them for a while, I would lay down with them for a while, and then when I was assured that they were asleep, I would go out, turn the Playboy channel on and I would – Kathy wouldn't be home until God knows what hours in the morning – and I go, That's when I would relieve my tension.  I would have to make sure the kids would be asleep and they wouldn't walk out of the room, they wouldn't walk out of the room while I'm masturbating.  And look at his.  God, what is this with them?  After I'm seeing the statement, after I'm locked up, I'm going, What the hell is this?  I was shocked when I seen this.  I couldn't believe it.

Q   The addition after you signature on page 2, how did that happen, two signatures on page 2?  Who added the second part?

A   Detective Jordan put it back in because I raised a fuss, because I felt like I was being cheated like, or, you know, railroaded, and he put it back into the typewriter, pulled it out and, you know, I signed it.

Trial Tr. at 79–94.

On the same day as petitioner's arrest, his father, Henry Eisemann, was arrested pursuant

to a three-count information.  The information charged Henry Eisemann with two counts of first

degree sodomy and one count of sexual abuse in the first degree.  Although the information does

not name the alleged victims, it indicates that at least one male and one female juvenile was

involved.  *See* District Court Information for Arrest No. 4-938-85.  While in police custody,

Henry Eisemann made an incriminatory statement.

B.      Attorney Misconduct

As noted above, petitioner's trial counsel, Harold Holtman, was disbarred and convicted

9

of a felony. Much of the following recitation is taken from the Affirmation of Anne L. Powers, Esq., counsel to the Grievance Committee for the Tenth Judicial District, who summarized the Grievance Committee's factual findings for the benefit of the New York Clients' Security Fund.

Petitioner and his father, Henry Eisemann, retained Harold Holtman to represent them. On August 12, 1985, four days after their arrest, the Eisemanns gave Holtman a $5000 cash advance retainer. *See* Powers Aff., at ¶ 23. At that time Mr. Holtman promised to give Michline Eisemann (Henry Eisemann's wife and Robert's mother) a receipt; he later refused to furnish it. *See id.* After receiving the $5000 retainer, Mr. Holtman refused to do any work on the Eisemanns' cases until they raised more money towards an unspecified fee. *See id.*

Shortly thereafter, Holtman convinced Henry Eisemann to withdraw money from his pension fund to pay his fee. *See id.* at ¶ 25. On August 21, 1985, Holtman wrote to the Pressroom Unions–Printers League, stating that Henry Eisemann had requested that he write in regard to an annuity check that was due in the near future and asked that the funds be released as soon as possible. On September 5, 1985, Holtman wrote a second letter to the Pressroom Unions–Printers League stating that he had appeared in court twice and that the matter would require several more appearances. *See id.* at ¶ 27. He again requested that the money be released on an emergency basis. Holtman wrote a third letter on November 14, 1995. The following day, the Pressroom Unions–Printers League wrote back and enclosed a check for $16,296.91. Holtman endorsed the check and Holtman deposited it in his personal account. *See id.* at ¶ 30. At the time that he deposited the check, Holtman told Henry Eisemann that he would have the check clear through his account, retain $5000 toward his fee, and return the balance to the Eisemanns. *See id.* at ¶ 31. In fact, Holtman retained $14,831.00 for himself and returned $1465

10

to the Eisemanns. *See id.* at ¶ 32.

Holtman demanded more money from Henry Eisemann. In order to raise funds, Henry

Eisemann submitted a mortgage loan application for $70,000 to the National Westminster Bank.

*See id.* at ¶ 33. The application stated that Henry Eisemann was disabled and that his disability

retirement on Social Security was pending. National Westminster Bank turned down the

mortgage loan application. Thereafter, Holtman had Michline Eisemann sign a blank mortgage

application which he prepared and submitted to the Greenpoint Savings Bank. *See id.* at 34.

This second mortgage application falsely stated that Henry Eisemann had an annual gross income

of $35,000. *See id.* at ¶ 37. It made no mention of the fact that in fact Henry Eisemann was

unemployed and was receiving disability benefits and food stamps. *See id.* at ¶ 36. Holtman

submitted the application knowing that it contained false and misleading information. *See id.* at

¶ 35. At the time of the second mortgage application, the Eisemanns' existing mortgage balance

was roughly $8000, with monthly payments of $328. After Holtman participated in the

Eisemanns' obtaining a new mortgage of $70,000, the required monthly payments rose to $938.

The Eisemanns could not afford the payments because Michline Eisemann's net income was

$150 per week.

At the closing on December 9, 1985, Holtman took for his own use $30,000 of the net

proceeds of $58,000. He had indicated that the $30,000 would be held in an escrow fund, but it

was not.

On the same day, petitioner was indicted on five counts of sodomy in the first degree.

*See* Nassau Count Indictment No. 62334. Each count alleged that petitioner had sodomized

Theresa R. at some time between August 1983 and August 1985. Holtman submitted a motion

11

seeking dismissal of the indictment on the grounds that it was overbroad. He also requested a bill of particulars to determine the date, time, and place of the offenses. The trial court denied the motion to dismiss and ordered that "[t]he People should make diligent efforts to provide any information which might give more specificity as to the dates of the five (5) counts." The People did not submit a written bill of particulars. One day after jury selection commenced, the prosecutor informed counsel that count one was alleged to have occurred between August 3, 1983 and August 8, 1983—while Ms. Sciubra was hospitalized—and that count two was alleged to have occurred on December 24, 1983 or December 24, 1984. The dates of the remaining three counts were not specified. The acts in question were allegedly reported by Theresa R. to her mother at least a year after the event, during the summer of 1985.

On the same day petitioner was indicted, Henry Eisemann was indicted on eighteen counts of sodomy in the first degree and five counts of sexual abuse in the first degree. *See* Nassau Count Indictment No. 62341. One of the counts of sodomy in the first degree charged Henry Eisemann with deviate sexual intercourse with Theresa R. The remaining twenty-two counts charged him with committing sexual acts with Theresa's twin brother Timothy. The indictment did not charge Henry Eisemann with any wrongdoing in connection with his grandson, Robert Eisemann, Jr.

The trial court docket reveals that Henry Eisemann was scheduled to be arraigned on December 20, 1985, but that his attorney was not present. On December 24, 1985, barely two weeks after being indicted, Henry Eisemann pled guilty to attempted sodomy in the first degree. Holtman retained Louis LaRosa, director of Pathways Counseling Center, to evaluate Henry Eisemann for sentencing. LaRosa arrived in court on April 9, 1986, to testify as to Henry

12

Eisemann's condition. Holtman arrived an hour late and asked LaRosa and an unknown attorney what he should say to the judge in court. *See* Powers Aff. at ¶ 7. While waiting in chambers for the judge, Holtman gave LaRosa a copy of Henry Eisemann's confession, which he had neglected to send him. *See id.* at ¶ 9. Henry Eisemann was sentenced to three to nine years.

LaRosa believed Holtman incompetent. He wrote a letter to the Grievance Committee in which he strongly criticized Holtman's failure to turn over important information about Henry Eisemann. *See id.* at ¶ 11(a). Had he possessed this information, LaRosa contended, he could have prepared a more detailed and accurate evaluation of Henry Eisemann, including information that would undermine the voluntariness of his confession. *See id.* at ¶ 11(b), (c). When LaRosa called Holtman on behalf of Michline Eisemann, Henry Eisemann's wife, and asked about the $30,000 in funds that were supposedly being held in escrow, Holtman became angry and refused to discuss the matter. *See id.* at ¶ 12.

On April 22, 1986, Holtman received a letter from Michline and Henry Eisemann terminating his services. *See id.* at ¶ 41. Holtman visited Henry Eisemann in prison on April 30, 1986, and had him sign blank sheets of paper. *See id.* at ¶ 42. Thereafter, Holtman drafted a self-serving affidavit using one of the signed blank sheets of paper countermanding the April 22 letter. On that same day, Holtman received a second letter from Michline Eisemann, again telling him that his services had been terminated. *See id.* at ¶ 43. On May 21, 1986, Holtman received a third letter from Michline Eisemann terminating his services and stating that he was "never authorized to use their money for their son Robert's defense." *Id.* at ¶ 44. In response, Holtman created another fraudulent affidavit, this time countermanding the May 21, 1986 letter. *See id.* at ¶ 45. On the same day, Holtman visited petitioner and had him sign blank sheets of

13

paper. Holtman used these sheets to forge a fraudulent affidavit in which petitioner purported to swear that he saw his father read and sign the affidavit, also fraudulent, after Holtman had explained it to him. *See id.* at ¶ 45. Holtman told petitioner that if he did not swear that he saw his father sign the full affidavit, he would "see to it that Robert would go to jail for a long period of time." *Id.* at ¶ 46.

During the summer of 1986 Holtman openly discussed Henry Eisemann's statements to him with others in violation Holtman's obligation not to reveal client confidences. He showed another attorney, James Caffrey, a copy of Henry Eisemann's confession, telling him, "he did it and he is a dirty old man" and "I really covered my ass with the money, because these people were going to run out on me." *Id.* at ¶ 17. Holtman also told his friends Steve Zacofsky, Paul Hastings, and Herb Gass about the Henry Eisemann's cause. Zacofsky later recounted the details of Henry Eisemann's case at an Alcoholics Anonymous meeting.

Several years after the conclusion of petitioner's trial, Holtman was convicted of fraud and was disbarred. *See In the Matter of Harold Holtman*, 547 N.Y.S.2d 335 (App. Div. 2d Dep't 1989).

C.    Suppression Hearing

There was a pre-trial hearing in August 1986 to determine whether petitioner's inculpatory statement to police was voluntarily given. During the hearing, Victor Regan, an associate of Holtman, conducted the defense. Counsel for petitioner is listed on the cover of the hearing transcript as "Harold Holtman, Esq." with "Victor M. Regan, Esq., of Counsel." Hr'g Tr. at 1. Mr. Holtman was present throughout the hearing. *See id.* at 12, 57, 184.

At the hearing, Detective Jordan testified that he and his partner had taken petitioner to

14

the station house, that he received his *Miranda* warnings, that he confessed to sodomizing

Theresa R., and that he voluntarily signed a written statement to that effect. *See* Hr'g Tr. at 2-16.

Petitioner testified at this hearing that he was not informed that he was under arrest and

was not read his *Miranda* rights; when he broached the subject of calling his attorney, Detective

Jordan told him that "[a]n innocent man don't need no attorney." Hr'g Tr. at 73.  Petitioner

vehemently denied that he had confessed to sodomizing Theresa.  He admitted that he had slept

in the same bed as Theresa on occasion when she climbed into bed with him and Ms. Sciubra.

As recounted in great detail *supra*, petitioner stated that the police manipulated his words to

make it sound as though he had penetrated the girl when he had only been sleeping with his arm

around her.  He also stated that the police pressured him into signing, and that he did not read the

second page of the statement. *See id.* at 90–92.  He claimed that he was administered a

polygraph test at the time he allegedly confessed and "passed."

In addition to petitioner and Detective Jordan, Detective Dempsey and Laura Lusmore,

petitioner's fiancée, testified.  At the close of the hearing, defense counsel asked and was granted

permission to submit a written memorandum of law concerning various legal issues raised at the

hearing.  No memorandum was ever submitted.  The trial court found that the People's witnesses

were more credible than the defense witnesses; that petitioner knowingly, intelligently, and

voluntarily waived his *Miranda* rights prior to being questioned; and that the statement was

voluntarily signed.  The court also rejected petitioner's contention that the right to counsel had

attached prior to questioning by virtue of being represented by counsel in the Family Court

dispute.

D.      Trial

The trial began on October 27, 1986.  The defense was conducted by Mr. Regan, although

Holtman, counsel of record, appears to have been present at all times.  *See* Trial Tr. at 41, 88,

168, 358.  Prior to the opening statements, the trial court permitted the prosecution to narrow

count one of the indictment to between August 3 and August 8, 1983 and count two to December

24, 1983 or 1984.  It also conducted a *Sandoval* hearing and determined that the prosecutor could

not cross-examine petitioner with regard to his prior criminal convictions for disorderly conduct

and third degree trespass.

The People's first witness was the victim, Theresa R.  At the time of the trial she was ten

years old.  *See* Trial Tr. at 51.  Prior to testifying, and outside of the presence of the jury, the trial

court questioned her to ascertain whether she was qualified to give sworn testimony.  Over

defense counsel's objection, it found that she understood her oath and duty to tell the truth.  *See*

*id.* at 51-56.  During the trial court's questioning it became apparent that Theresa R. did not want

to face the open court and petitioner.  As she entered, the trial judge said, "Good afternoon,

Theresa.  I was afraid you were turning your back to me.  Are you?"  *Id.* at 51.  She answered that

she was not.  However, she did not face the open court.  Later in the colloquy, the judge said,

"Why don't you turn around just a little bit, and this man over here with the Stenographic

machine will be able to hear you a little bit better."  *Id.* at 53.

At the end of the colloquy, the trial judge permitted the child witness to testify facing

away from petitioner and the jury:

> She also indicated when I asked her to turn around and face the front, to both the
> Reporter and myself to be able to hear her, that she really didn't want to, and I
> gather the reasons are very obvious in view of the fact that the defendant sits in

16

front of her.

There are certainly audibility problems.  It would seem to me that the best arrangement would be if the court officer would take the microphone out from the stand and hold the microphone up to the witness, in close proximity to her so that we can assist in her being heard by the jurors.

*Id.* at 58.  Defense counsel did not object.  No hearing was held to determine whether Theresa R. would be emotionally traumatized by facing petitioner while testifying.  As noted *infra*, the record suggests that she faced away from the judge, jury, and petitioner for much, if not all, of her testimony.

Theresa R. testified that sometime in August 1983, while her mother was hospitalized and after the home care worker had gone home, petitioner "tried to stick his private spot up my rear end."  Trial Tr. at 67.  She also testified that "it" happened again on Christmas Eve and three other times.  *See id.* at 67, 73.  On cross-examination, Theresa conceded that she could not remember the dates of the attacks and that she had asked petitioner to accompany her to a father-daughter school dance after he had moved out of Ms. Sciubra's residence.  *See id.* at 79.  Ms. Sciubra testified as to her relationship with petitioner and to the fact that he spent many evenings at her home, although he did not live there permanently.

Detective Jordan testified that he had told petitioner to accompany him back to the police station.  Once there, he told petitioner that he was under arrest and read him his *Miranda* rights from a card.  He then informed petitioner of the charges made against him by Theresa R.  When petitioner denied the charges, Detective Jordan told him that his father had been arrested for sodomizing Theresa, her brother, and petitioner's son.  *See* Trial Tr. at 101.  He later informed petitioner that his father had confirmed that he, the father, had molested Theresa.  *See id.* at 103.

No objection was made to the mention of Henry Eisemann's confession. Detective Jordan testified as to the incriminatory statements made by petitioner and the confession he signed. The confession was introduced into evidence and was read to the jury. *See id.* at 108-09.

Petitioner presented two witnesses who testified that he had been found to be unsuitable for jury duty in 1980 because he could not understand English. *See, e.g.*, Trial Tr. at 185. His fiancée testified that on the evening of petitioner's arrest, he had called her. The trial court upheld a hearsay objection with respect to the substance of that call. The prosecution called Detective Dempsey as a rebuttal witness, who testified that he had heard petitioner read part of his statement aloud and the rest he read, apparently to himself, before signing it.

Defense counsel moved for an order of dismissal on the following grounds: (1) neither Theresa R. nor Josephine Sciubra, her mother, had identified petitioner; (2) the child's testimony was that petitioner "tried" to make contact with her anus, not that he had done so; (3) the indictment was defective for lack of specificity; and (4) the People failed to provide any corroborative evidence. The motion was denied. Defense counsel also made a *Brady* motion, demanding a mistrial because the prosecution had failed to turn over the result of a medical examination of the child until well after the child had testified. The medical report stated that the child had told the doctor that her "father and grandfather touched her V, used tongue and other." Trial Tr. at 234. The court denied the motion.

During summation, both the defense and the prosecution referred to the fact that Theresa R. did not face them. Defense counsel stated: "Who does she confront? Nobody. Why? I wonder why. She wouldn't look at you or [the prosecutor]." Trial Tr. at 294. The prosecutor's summation included the following:

18

It is no secret for the most part that [Theresa R.] faced the side and, indeed, the back of the courtroom when she gave her testimony. What can we draw from this reality, this observation?

I suggest to you, ladies and gentlemen, the evidence shows that the reason she did not wish to look into the main lobby of the courtroom was because of one individual sitting in this courtroom. Not yourself, not myself, but Robert Eisemann. I suggest to you the evidence shows that the reason she was looking in the direction she was looking was because she did not even want a peripheral view of that man.

*Id.* at 305-06.

As the jury was deliberating, Holtman told petitioner that it looked as though he would be convicted and advised him to flee to another state. *See* Powers Aff., at ¶¶ 50-51. He fled. Defense counsel waived petitioner's absence for purposes of re-charging the jury. The jury returned a verdict of guilty on the first three counts of the indictment and not guilty on counts four and five. A bench warrant for petitioner's arrest was issued.

Petitioner was sentenced *in absentia* to three concurrent eight-and-one-third to twenty-five year terms on the three counts for which he was convicted. On the day that Holtman was served with a Notice of Petition by the Grievance Committee for the Tenth Judicial District, the Nassau County Warrant Squad received an anonymous phone call telling them petitioner's whereabouts. *See* Powers Aff., at ¶ 55. Petitioner was arrested and the sentence was executed.

E.      Post-Conviction Proceedings

Petitioner appealed his conviction to the Appellate Division, Second Department. His counsel on appeal, Marvin E. Basson, prepared a shoddy brief. The "Statement of Facts" is only five sentences long and completely omits any mention of the trial. The brief raised nine legal arguments but fails to cite a single case. The Appellate Division affirmed petitioner's conviction.

19

*See People v. Eismann* [*sic*], 551 N.Y.S.2d 304 (App. Div. 1990).  Years later, petitioner's

appellate counsel was convicted of violating federal securities laws and resigned from the bar.

*See In the Matter of Marvin E. Basson*, 631 N.Y.S.2d 535 (App. Div 2d Dep't 1995) (per

curiam).

Several years after conviction, petitioner filed a petition for a writ of error *coram nobis*,

alleging that he received ineffective assistance of appellate counsel.  The People submitted an

affirmation in support of petitioner's motion, conceding that appellate counsel had been

ineffective.  *See* Affirmation in Support of Assistant District Attorney Edward Miller, Mar. 5,

1997.  On September 17, 1997, the Appellate Division vacated its 1990 judgment, assigned

petitioner new counsel, and ordered reargument.  *See People v. Eisemann*, 664 N.Y.S.2d 732

(App. Div. 1997).

In his second direct appeal, petitioner raised five claims:

(1)    that the third count of the indictment was fatally overbroad and duplicitous;

(2)    that petitioner was denied the right to confront his accuser because Theresa
        R. testified facing away from petitioner;

(3)    trial counsel was ineffective due to a conflict of interest;

(4)    trial counsel was ineffective for failing to submit a summation after the pre-
        trial hearing; for failing to object to the introduction of Henry Eisemann's
        confession; and for making other "significant errors"; and

(5)    the sentence was harsh.

With respect to the first claim, the Appellate Division agreed that the two-year time period

alleged in the third count of the indictment was unreasonable on its face and dismissed that

count.  *See People v. Eisemann*, 670 N.Y.S.2d 39, 40 (App. Div. 1998).  The court held that

20

petitioner's Confrontation Clause claim was unpreserved for appellate review.  In any event, defense counsel's failure to object was "actually a calculated tactical maneuver" and thus did not warrant review in the interest of justice.  *See id.*  Turning to the conflict of interest claim, the Appellate Division found that nothing indicated that Holtman divulged or used any of Henry Eisemann's confidences or secrets.  *See id.*  It concluded that "[h]indsight does not elevate unsuccessful trial tactics into ineffective assistance of counsel."  *Id.* at 41.  The Appellate Division held that the remaining claims were without merit.  *See id.*  Leave to appeal to the New York Court of Appeals was denied.  *See People v. Eisemann*, 699 N.E.2d 442 (N.Y. 1998).

In May 1999, petitioner filed a timely petition for a writ of habeas corpus.  In it he raises three claims: (1) that he was deprived of the right to conflict-free counsel; (2) that counsel was ineffective for, *inter alia*, failing to submit a post-hearing brief and to make appropriate objections at trial; and (3) that his Confrontation Clause rights were violated.

III.    Law

    A.    AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  *See Price v. Vincent*, 155 L.Ed.2d 877, 885–86 (2003).

21

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

B.     Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522 (1989). "This exhaustion requirement is . . . grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). The exhaustion requirement requires the petitioner to have presented to the state court

22

"both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

The state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3); *see also Ramos v. Keane*, No. 98 CIV. 1604, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y. 2000) (state's failure to raise exhaustion requirement does not waive the issue).

A claim may be presented for habeas review even if the federal grounds were not explicitly asserted before the state courts if the petitioner, in asserting his claim before the state court, relied on pertinent federal cases employing constitutional analysis, relied on state cases employing constitutional analysis in like fact situations, asserted his claims in terms so particular as to call to mind specific rights protected by the constitution, or alleged a pattern of facts well within mainstream of constitutional litigation. *See Daye v. Attorney General*, 696 F.2d 186 (1982).

### C.  Procedural Bar

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the

merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need
not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly
invokes a state procedural rule as a separate basis for its decision).

IV.     Analysis of Claims

  A.     Ineffective Assistance of Counsel Due to Conflict of Interest

  Petitioner first claims that he was deprived of the effective assistance of counsel because
counsel was laboring under a conflict of interest as a result of his near-simultaneous
representation of both petitioner and his father, who were essentially co-defendants accused of
committing the same crimes. At the hearing in this matter, respondent suggested that this claim
might be unexhausted and sought leave to file a memorandum with this court explaining its
position. The application was denied. Petitioner's claim was exhausted on direct appeal. *See*
Brief for Defendant-Appellant, at 39–46; Letter from Edward Miller, Legal Aid Society, to Hon.
Judith S. Kaye, at 1–3 (Mar. 25, 1998) (leave application). The claim was addressed and denied
on the merits by the Appellate Division. *See People v. Eisemann*, 670 N.Y.S.2d 39 (App. Div
1998).

  The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall
enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.
The right is accorded "not for its own sake, but because of the effect it has on the ability of the
accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658 (1984). The right to
counsel is "the right to *effective* assistance of counsel," *McMann v. Richardson*, 397 U.S. 759,
771 n.14 (1970) (emphasis added), and assistance that is ineffective in "preserving fairness does
not meet the constitutional mandate." *Mickens v. Taylor*, 122 S. Ct. 1237, 1240 (2002). The

right to the effective assistance of counsel also includes the right to conflict-free counsel. *See*

*Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our

Sixth Amendment cases hold that there is a correlative right to representation that is free from

conflicts of interest."). *Cf. Holloway v. Arkansas*, 435 U.S. 475, 490-91 (1978).

In general, in order to prevail on a Sixth Amendment claim, a petitioner must prove both

that counsel's representation "fell below an objective standard of reasonableness" measured

under "prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and

that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different," *id.* at 694. *See also Wiggins v. Smith*, 539 U.S. __,

No. 02-311, slip op. at 8–10 (June 26, 2003); *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir.

2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the

outcome." *Strickland*, 466 U.S. at 694.

Exceptions to the *Strickland* rule exist. "Actual or constructive denial of the assistance of

counsel altogether is legally presumed to result in prejudice." *Strickland*, 466 U.S. at 692.

"Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial

testing, then there has been a denial of Sixth Amendment rights that makes the adversary process

itself presumptively unreliable." *United States v. Cronic*, 466 U.S. 648, 659 (1984). In such

cases, a *per se* rule of prejudice exists. *See Strickland*, 466 U.S. at 692.

An intermediate level of review exists between the general *Strickland* requirement of a

showing of actual prejudice and cases involving utter deprivation of counsel, like *Cronic*, where

prejudice is presumed *per se*. This intermediate level, which governs conflicts of interest, is set

forth in *Cuyler v. Sullivan*, 446 U.S. 335 (1980). As the *Strickland*, court explained, where an

attorney labors under an actual conflict of interest there is a "fairly rigid rule of presumed

prejudice" that is "not quite the per se rule" discussed in *Cronic*:

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan*, 446 U.S., at 345–350, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, *see, e.g.*, Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, *supra*, at 350, 348 (footnote omitted).

*Strickland*, 466 U.S. at 696–97.

The clearly established federal law, as determined by the Supreme Court of the United

States, with respect to ineffective assistance claims premised on conflicts of interest is thus set

forth in *Cuyler* and *Strickland*. Petitioner must show (1) that defense counsel actively

represented conflicting interests, and (2) that an actual conflict of interest adversely affected his

lawyer's performance. This rule, as the Supreme Court has repeatedly noted, presumes prejudice

nearly per se.

The *Cuyler-Strickland* standard has been clarified by both the Supreme Court and the

Court of Appeals for the Second Circuit. An actual conflict of interest exists when, during the

course of the representation, "the attorney's and defendant's interests diverge with respect to a

material factual or legal issue or to a course of action." *United States v. Feyrer*, 333 F.3d 110,

116 (2d Cir. 2003) (quoting *United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir. 2002)). The

conflict must actually have affected counsel's performance and may not be "a mere theoretical division of loyalties." *Mickens*, 122 S. Ct. at 1243. Counsel's performance is deemed affected when he or she opts to forego a viable alternative defense strategy because of the conflict. *See Feyrer*, 333 F.3d at 118. A defendant who "shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Mickens*, 122 S. Ct. at 1243 (quoting *Cuyler*, 446 U.S. at 349–50).

There is some disagreement among the federal courts of appeals as to whether a petitioner claiming his lawyer worked under a conflict of interest must show that the abandoned defense strategy was prudent or even reasonable. In the Second Circuit, a petitioner need only show "that the alternative strategy was plausible." *Feyrer*, 333 F.3d at 118. Other circuit courts have concluded that the alternative strategy must reach the slightly higher threshold of reasonableness. *See, e.g.*, *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc) ("the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision"), *aff'd* 122 S. Ct. 1237 (2002); *Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999) (the alternative must possess "sufficient substance to be a viable alternative") (citation omitted). This minor disagreement among the courts of appeals does not obscure the basic clarity of the Supreme Court's jurisprudence with respect to attorney conflicts of interest, particularly where, as here, the alternative strategies abandoned by petitioner's counsel were plausible, reasonable and sensible.

In the instant case, the Appellate Division held that Holtman was not ineffective as a result of a conflict of interest, but it did so without direct reference to federal law or precedent from the Supreme Court:

27

There is no merit to the defendant's contention that the defense counsel was ineffective due to a conflict of interest (*see*, *People v. Recupero*, 73 N.Y.2d 877, 538 N.Y.S.2d 234, 535 N.E.2d 287; *People v. Alicea*, 61 N.Y.2d 23, 471 N.Y.S.2d 68, 459 N.E.2d 177). The defense counsel's associate previously represented the defendant's father, who pleaded guilty to sexually assaulting the same victim. However, there is no indication that the defense counsel divulged or used any of the prior client's confidences or secrets. The defense counsel merely used the father's plea of guilty to support the defense theory that the father also perpetrated the crimes charged against the defendant. Hindsight does not elevate unsuccessful tactics into ineffective assistance of counsel (*see*, *People v. Baldi*, 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400).

*People v. Eisemann*, 670 N.Y.S.2d at 40-41.

The state-law case relied upon by the Appellate Division, *People v. Recupero*, 535 N.E.2d 287 (1988), acknowledges that an ineffectiveness claim premised on an attorney's conflict implicates both the New York and federal constitutions. *Recupero*, which involved an attorney conflict manifesting itself at the plea stage, sets forth the standards applied by the Appellate Division in the instant case:

> The joint representation of codefendants by a single attorney creates a potential conflict of interest between the attorney and each of his clients, thereby threatening each defendant's right to effective assistance of counsel guaranteed by both the State and Federal Constitutions (NY Const, art I, § 6; US Const 6th Amend). . . . Joint representation is not *per se* forbidden, however, and vacatur of the plea will only result where the defendant demonstrates that a significant possibility of a conflict of interest existed bearing a substantial relationship to the conduct of the defense (*People v McDonald*, 68 NY2d 1, 9; *People v Lombardo*, 61 NY2d 97, 103; *People v Serio*, 87 AD2d 978; *cf.*, *People v Mattison*, 67 NY2d 462, *cert denied* 479 US 984). We have not attempted to define a "significant possibility" previously, preferring to analyze conflict claims on a case-by-case basis. Our decisions make clear, however, that a significant possibility is more than a potential conflict of interest and that before relief will be accorded the conflict must do more than exist, it must have "operated."

*Recupero*, 535 N.E.2d at 289.

It is unclear whether the Appellate Division's "significant possibility of a conflict" test

accords with the *Strickland* and *Cuyler* standards already discussed, and it is therefore uncertain whether review of petitioner's claims by this federal court should proceed under the "unreasonable application" or "contrary to" clauses of AEDPA. The question is academic, however, since under either articulation of the AEDPA standard petitioner's claim warrants habeas relief.

      1.     Conflicting Interests of Petitioner and Henry Eisemann

Multiple representation, even of co-defendants in the same case, "does not violate the Sixth Amendment unless it gives rise to a conflict of interest." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Petitioner and his father were not literally co-defendants but they were effectively so. The potential for a conflict of interest in the circumstances was patent and obvious. Harold Holtman's representation of both petitioner and Henry Eisemann in these criminal matters in fact created an actual conflict of interest.

Petitioner and his father were both arrested on the same day and charged with molesting the same victim during the same period of time. The investigating detective who interrogated and arrested petitioner is the same detective listed in the District Court Information charging Henry Eisemann with molestation crimes. That detective was knowledgeable about the crimes alleged committed by both men, and utilized information from the separate cases when interrogating the men. Both petitioner and his father were indicted on the same day. Although at no time were petitioner and his father actually co-defendants in a single criminal case, the fact that they were the subjects of parallel investigations, arrests, interrogations and indictments demonstrates that their cases were so closely related as to make joint representation a serious problem for any competent and ethical defense lawyer.

Petitioner contends, and respondent does not dispute, that the trial court was aware at the time of petitioner's trial that Holtman had been representing both Eisemanns. *See* Br. for Defendant-Appellant at 42 (quoting portions of the trial transcript indicating that the trial court was aware that both Eisemann's were represented by Holtman). Under these circumstances, both Holtman and the trial court should have informed petitioner of the dangers that petitioner might face as a result of Holtman's conflicting interests. Petitioner's father's guilty plea and sentence on a number of the molestation charges, even though completed before the start of petitioner's trial, did not relieve either Holtman or the trial court of their duty to warn and advise petitioner of the lawyer's potentially conflicting obligations. Apparently inquiry was never made of petitioner concerning a conflict. There was no waiver. The fact that Holtman's associate, Victor Regan, actually conducted the trial is not relevant to petitioner's conflict of interest claim, as respondent rightly concedes. *See* Mem. of Law in Opposition to Pet'n for a Writ of Habeas Corpus, at 24 n.11.

Petitioner has demonstrated that he suffered prejudice—in the form of a reduced set of alternatives open to his lawyer to pursue during trial—as a result of Holtman's successive representation of his father and then of petitioner in related criminal matters. As discussed above, the federal appellate courts that have glossed Supreme Court precedent on the topic agree that a defendant cannot receive constitutionally effective assistance of counsel when his lawyer labored under a conflict that prevented him from pursuing a viable and reasonable alternative defense strategy. In the instant case, the abandoned alternatives were not only reasonable but eminently sensible.

First and most obvious, Holtman could have called Henry Eisemann as a witness.

30

Because Henry Eisemann had already been convicted and sentenced at the time of petitioner's trial, he could not have refused to testify on Fifth Amendment self-incrimination grounds. As respondent notes, part of the defense strategy was to suggest that Henry Eisemann, and not petitioner, had sodomized Theresa R. *See* Trial Tr. at 292 ("You heard testimony from Detective Jordan that Theresa R. was sexually abused by her grandfather, Henry Eisemann, sexually abused by her grandfather. Nobody has disputed that. Nobody."). Calling Henry Eisemann to the stand would have allowed the defense to showcase to the jury the confessed, serial pedophile who had been loose in the victim's home. Henry Eisemann could have been examined in an effort to elicit details about his usual method of abuse in order to suggest that he, rather than petitioner, had performed the particular acts ascribed to petitioner. Had he taken the stand, Henry Eisemann might even have sought to harbor his son from conviction by stating unequivocally that it was he and not his son who had abused Theresa R. on the specific dates at the specific times alleged. At the very least, calling Henry Eisemann to the stand could have substantially bolstered the defense's argument that while the senior Eisemann had molested Theresa R., petitioner's contact with her was purely accidental and noncriminal.

Holtman's failure to call Henry Eisemann to the stand on petitioner's behalf is attributable in two ways to the conflict of interest that resulted from his earlier representation of petitioner's father. First, Holtman could not have effectively examined Henry Eisemann because to do so would risk revealing client confidences in breach of the rules of ethics. *See, e.g.*, N.Y. CODE OF PROF'L RESPONSIBILITY DR 4-101 (2003) (Preservation of Confidences and Secrets of a Client), DR 5-108 (Conflict of Interest; Former Client). Holtman's questioning of Henry Eisemann would of necessity be circumscribed and self-censored in order to prevent the

31

accidental revelation of potentially inculpatory information to which Holtman may have been privy. Such a possibility is not idle speculation in a case in which two defendants who are accused of molesting the same victim during the same time period are represented by the same lawyer, and where one defendant has a viable defense that the other defendant actually committed the crime.

Second, Holtman was undoubtedly influenced in his decision not to call Henry Eisemann to the stand by the fact that during his representation of Eisemann he had bilked the family of tens of thousands of dollars. Holtman must surely have suspected that, had Henry Eisemann taken the stand, the answers to his questions on direct examination might have strayed toward a condemnation of the crooked lawyer himself. Such a circumstance would seem not at all implausible were Holtman, for instance, to suggest to Henry Eisemann that he, rather than petitioner, had engaged in the molestation charged in the instant case. If Eisemann, rather than embracing the opportunity to save his son by taking responsibility for these acts of abuse in addition to those for which he confessed, instead took offense at the lawyer's suggestion, he might well have thought to expose Holtman as a charlatan and thief in open court. It is quite reasonable to suspect that Holtman would not take such a risk by calling Henry Eisemann to the stand. Although admittedly resulting from Holtman's felonious behavior while representing Henry Eisemann, the prior representation helped create a conflict of interest that effectively precluded Holtman's us of this otherwise viable and reasonable defense strategy.

A second strategy that would have been open to an unconflicted lawyer but that was not open to Holtman was to argue that Henry Eisemann was coerced into signing his confession. The logic behind this defense theory would be that Theresa R. had fabricated all allegations of

32

abuse at the insistence of her mother. In light of the custody battle between petitioner and Ms.

Sciubra, such an argument might have been compelling, if difficult. Such a defense, as thus

stated, would not be viable unless Henry Eisemann's confession were proven false. To prove

this, Holtman would either have to admit that he himself coerced his former client into pleading

guilty, betray his former client by asserting that the guilty plea constituted perjury, or concede

malpractice on the ground that he had failed to sufficiently challenge the confession. Again, a

reasonable alternative strategy was precluded by Holtman's representation of Henry Eisemann.

Although Holtman's concession at trial that Henry Eisemann had molested Theresa R. was

justifiable as a sound trial strategy, in the context of an ineffective assistance claim premised on a

conflict of interest, that fact alone is not dispositive of whether a constitutional violation has been

established. The question is not whether or not the attorney did, in fact, pursue a sound trial

strategy. Rather, it is whether or not the attorney was forced to forego a reasonable (though not

necessarily better) strategy because of the conflict.

A third defense avenue not open to Holtman was to encourage petitioner to accept a plea

in exchange for testifying against his father. While the record does not indicate that petitioner

was offered a plea agreement, it is far from hypothetical speculation to conclude that a plea

agreement might well have been reached if Holtman had been proactive with the district attorney

in seeking one. While petitioner was facing a five-count indictment, his father was facing a

twenty-three count indictment. The People eventually permitted Henry Eisemann to plead to a

single count in satisfaction of the whole indictment. Again, Holtman's representation of both

Eisemanns precluded him from seeking a favorable plea agreement for petitioner. Doing so

would obviously have violated his obligation to Henry Eisemann. *See, e.g.*, N.Y. CODE OF

PROF'L RESPONSIBILITY DR 7-101 (2003) (Representing a Client Zealously), DR 5-105 (Conflict of Interest; Simultaneous Representation).  It is reasonable to suspect, in view of Holtman's shabby and completely unprofessional conduct, that he sacrificed one client, the son, because most or all of his ill-gotten fee was obtained from his paying client, the father.  He who pays the piper calls the tune.

Respondent asserts that no actual conflict of interest existed, citing the Appellate Division statement that "there [was] no indication that the defense counsel divulged or used any of the prior client's confidences or secrets." *Eisemann*, 670 N.Y.S.2d at 40.  This argument sidesteps the issue.  The relevant consideration is not whether Holtman, during his representation of petitioner, divulged any of his father's confidences or secrets, but whether Holtman's representation was constrained by a desire to avoid doing so.  The problem with Holtman's representation is not what he did but what he did not do or might have done.  *See Holloway v. Arkansas*, 435 U.S. 475, 489-90 (1978) ("Joint representation of conflicting interests is suspect because of what it tends to *prevent* the attorney from doing." (emphasis added)).  Here, Holtman was prevented from pursuing a variety of reasonable strategies by virtue of his representation of Henry Eisemann.

The state courts' conclusion that petitioner received constitutionally effective assistance of counsel notwithstanding his lawyer's conflict of interest is both contrary to and an unreasonable application of clearly established federal law as determined by the Supreme Court in *Strickland* and *Cuyler*.

2. Conflicting Interests of Robert Eisemann and Harry Holtman

Although not necessary to the disposition of this matter, a second actual conflict of

34

interest exists in this case as a result of Holtman's gross malfeasance. Holtman was found by the Grievance Committee to have stolen money from the Eisemann family, forged false affidavits to excuse his conduct, and threatened petitioner with jail time if he did not vouch for fabricated affidavits. Holtman's misconduct with regard to the Eisemann family was a primary reason for his subsequent disbarment. *See* Petitioner's Brief, at 15-16. Petitioner does not exaggerate when he states that "Holtman . . . spent the better part of the year prior to petitioner's trial deceiving, threatening, and defrauding" the Eisemann family, including petitioner. *Id.* at 15. In so doing, Holtman violated the law and the most basic rules of ethics. *See, e.g.*, N.Y. CODE OF PROF'L RESPONSIBILITY DR 7-101 (2003) (Representing a Client Zealously), DR 5-101 (Conflicts of Interest–Lawyer's Own Interests).

The fact that Holtman merely breached his ethical obligations is, according to decisions of the Supreme Court, not dispositive on the question of whether or not he provided constitutionally effective assistance of counsel: "[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Nix v. Whiteside*, 475 U.S. 157, 165 (1989) (*quoted in Mickens v. Taylor*, 122 S. Ct. 1237, 1246 (2002)). Holtman's behavior did not merely involve the breach of a rule of ethics; instead, it involved the wholesale disregard of the most fundamental norms of professional decency. Holtman's interest in concealing his massive wrongdoing eclipsed his interest in zealously safeguarding his client's rights. His intolerable conduct created a second actual conflict of interest.

As in the first instance, the problem is not what Holtman did in the course of representing petitioner. It is what he did not do or might have done. Representation by an attorney who is

35

actively engaged in the wholesale defrauding of his client "is suspect because of what it tends to prevent the attorney from doing." *Holloway v. Arkansas*, 435 U.S. 475, 489-90 (1978). As Judge Friendly noted, "The problem . . . is not simply one of competence—[the attorney] may very well have had greater competence to represent a defendant in a criminal trial than some leaders of the profession . . .—but that he was engaging in a crime." *Solina v. United States*, 709 F.2d 160, 164 (2d Cir. 1983). "Such a person cannot be wholly free from fear of what might happen if a vigorous defense should lead the prosecutor or the trial judge to inquire into his background and discovery his lack of credentials." *Id.* at 164.

Judge Friendly wrote in the context of a defendant who was represented by a person who was not a licensed attorney. Much of the Friendly analysis applies in the instant case. Like the pseudo-attorney in *Solina*, Holtman must have been inhibited in his defense of petitioner by virtue of his fear that his illegal activities would be discovered. An attorney who was not busy defrauding his clients and attempting to conceal this fraud might make different arguments, or make the same arguments in a more compelling way. An attorney uncompromised by wrongdoing might speak the same words, but the tune would be different, perhaps sung with greater ardor. Such nuance is not always perceptible when reviewing a cold record. But, regardless of the magnitude of difference in performance between an honest attorney and a grossly unethical one, "a criminal defendant is entitled to be represented by someone free from such constraints." *Solina*, 709 F.2d at 164. Habeas relief is also warranted on this ground. It is not, however, the ground relied upon in this memorandum, which is exhausted and dispositive.

So gross was Holtman's debasement of his legal status as an attorney that he can well be considered *pro hac vice* as no attorney at all.

36

Respondent argues that this second claim of conflict is unexhausted. It is not disputed that petitioner raised a conflict of interest claim in the state courts; the question is whether he raised Holtman's moral and ethical turpitude as a basis for the claim. Petitioner notes that the entire file of *In the Matter of Harold Holtman*, 547 N.Y.S.2d 335 (App. Div 2d Dep't 1989), was made part of his appeal to the Appellate Division. Petitioner referenced Holtman's misconduct several times in his appellate brief. *See* Brief for Defendant-Appellant at 39, 42, 44. The misconduct was also mentioned in the letter to the Court of Appeals seeking leave to appeal. *See* Petitioner's Letter, Mar. 25, 1998, at 2.

Although petitioner did not use the term "conflict of interest" with respect to Holtman's malfeasance in state courts, both the legal claim of conflict of interest and the facts underlying Holtman's actions were presented to the state courts. The claim should be deemed exhausted. In the event that the Second Circuit Court of Appeals finds the second claim of conflict to be unexhausted and remands the matter, this court would allow petitioner to return to the state courts and file a motion pursuant to section 440.10 of the New York Criminal Procedure Law. That procedure would be a waste of both federal and state court time. In any event, the first, primary claim of conflict is exhausted and requires, by itself, granting of the writ.

B.      Other Claims of Ineffective Assistance of Counsel

Petitioner also contends that trial counsel was ineffective for failing to submit a legal brief or at least a summation after the pre-trial hearing and for failing to make various objections at trial. The claims are exhausted and were denied on the merits. Review proceeds under the deferential standards of AEDPA. These claims are governed by *Strickland* and require a showing that counsel's performance fell below an objective standard of reasonableness measured under

prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Review of these *Strickland* claims leads to the conclusion that with respect to these grounds alone petitioner has not made a sufficient demonstration of prejudice to warrant habeas corpus relief.

    C.      Violation of Confrontation Clause

    Petitioner also claims that his Confrontation Clause rights were violated because the child witness, Theresa R., faced away from him and the jury while testifying. There is some dispute as to whether the child was facing away from petitioner and the jury at all times or only part of the time, or whether she was sitting sideways. Respondent contends that the record fails to establish that Theresa's face was "continuously and completely" turned away from petitioner "throughout her testimony." Opposition Brief, at 10. Respondent is correct to the extent that the record does not indicate which direction Theresa R. is facing at all times. Nonetheless, the record may fairly be read to indicate that, for the most part, she was facing away from the judge, jury and petitioner.

    After asking Theresa her name, age, and date of birth, the prosecutor asked her, "Theresa, can you look at me over here?" Trial Tr. at 61. She replied, "No." *Id.* at 61. In closing, the prosecutor stated that "for the most part . . . she faced the side and, indeed, the back of the courtroom when she gave her testimony." *Id.* at 305. The prosecutor later stated that "she did not even want a peripheral view of that man." *Id.* at 306. It is impossible to determine now exactly in what direction Theresa R. faced while testifying; she may well have faced the side during some points and toward the back of the courtroom during other times. For purposes of this memorandum, the court will assume that she faced away from petitioner and the jury during

her entire testimony.  No objection was registered at trial.

As respondent correctly notes, the claim is procedurally barred.  The Appellate Division held that the issue was unpreserved for appellate review, citing New York's contemporaneous objection rule.  *See People v. Eisemann*, 670 N.Y.S.2d 39, 40 (App. Div. 1998) (citing N.Y. Crim. Pro. Law § 470.05[2]).  This rule is an independent and adequate state ground for dismissing the claim.  The procedural default may be excused under *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), only if petitioner can show both cause and prejudice.

No such showing is possible.  Although petitioner's trial counsel was ineffective for the reasons already set forth, nothing indicates that his decision not to make a Confrontation Clause objection to the manner in which the child was testifying had anything to do with his conflicts of interest.  As the Appellate Division suggested, it is far more likely that the failure to object was a "calculated tactical maneuver" made by the associate who conducted the trial with Holtman sitting beside him as attorney of record.  *See Eisemann*, 670 N.Y.S.2d at 40.  During summation, defense counsel argued that the child witness refused to face petitioner and the jury because she was lying.  *See* Trial Tr. at 294.  In response, the prosecution stated that the fact that the child witness faced away from petitioner because she was afraid of him.  *See id.* at 305-06.

Although the issue is unpreserved for review by this court, it does raise an interesting legal question.  The Supreme Court has held that the erection of a screen between the witness and the defendant, through which the defendant could dimly see the witness without the witness being able to see him, was a violation of the Confrontation Clause.  *See Coy v. Iowa*, 487 U.S. 1012 (1988).  Subsequently, however, the Supreme Court held that "face-to-face confrontation . . . is not the *sine qua non* of the confrontation right."  *Maryland v. Craig*, 497 U.S. 836, 847

39

(1990). Instead, the Confrontation Clause reflects merely a "preference" for face-to-face confrontation. *Id.* at 849. In *Craig*, the Court upheld a one-way closed circuit television procedure utilized after a specific showing that the child witness would be traumatized by testifying before the defendant.

In upholding the closed circuit system, the Court held that a defendant's confrontation clause rights are not violated where

> [t]he child witness [is] competent to testify and testif[ies] under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor and body of the witness as he or she testifies.

*Craig*, 497 U.S. at 851. While the first two of these factors were satisfied during Theresa R.'s testimony, her face was apparently not visible to the judge, jury or petitioner. Had the trial judge permitted the witness to testify facing away from petitioner over petitioner's objection, the arrangement could arguably have been found to have violated his Confrontation Clause rights. Given the procedurally defaulted status of the claim, further consideration of this interesting legal question is unnecessary.

V.    Conclusion

The petition for a writ of habeas corpus is granted. Petitioner shall be released unless within sixty days the state commences prosecution or takes other action appropriate in light of this decision. This decision is stayed until all federal appellate proceedings are completed and a final mandate is received by this court.

No certificate of appealability is granted with respect to petitioner's remaining claims, petitioner having failed to make a substantial showing of the denial of a constitutional right.

Petitioner has a right to seek a certificate of appealability on his other claims from the Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 123 S.Ct. 1029 (2003).

SO ORDERED.

Jack B. Weinstein
Senior District Judge

Dated:      July 31, 2003
            Brooklyn, NY